IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THOMAS R, MILLER
appellant,

V.

STATE OF DELAWARE
appellee.

Cr.A. NOS S92-12-0044 Thru S92-12-0047

1:08-CV-137 (GMS)

## APPENDIX TO OPENING BRIEF OF GROUND ONE

FILED

APR 11 2008

U.S. DISTRICT COURT
DISTHIC

(B) scanned

*Thomas R. Miller*
THOMAS R, MILLER
DCC
1181 PADDOCK RD.
SMYRNA, DE 19977

DATED: April 9, 2008

TABLE OF CONTENTS TO APPENDIX
OF GROUND ONE

PAGE

One waiver of indictment Exhibit (A-1) . . . . . . . .
One statue page 3 to 8 Exhibit (A-2) . . . . . . . . . . 1
One court docket Exhibit (A-3) . . . . . . . . . . 1
One 2 page information Exhibit (A-3) 2 letters Exhibit (A-3) . . . 1
One 2 page information Exhibit (A-4) . . . . . . . . 2

T

PAGE

## TABLE OF CONTENTS TO APPENDIX
## OF GROUND ONE

One waiver of indictment (A-1)

One statue page 3 to 8    (A-2)

One superior Court criminal document page 14, (A-3)

TWO Letters one from Judge Graves, one from Rosemary B. Beauregard Exhibit (A-3)

One 2 page information Exhibit A-4

## PUBLIC DEFENDER OF THE STATE OF DELAWARE
### SUSSEX COUNTY OFFICE
### 12 EAST PINE STREET
### GEORGETOWN, DELAWARE 19947

CERTIFIED
AS A TRUE COPY
ATTEST
PROTHONOTARY
Per
CLERK

DATE 12/3/92

THIS WILL CONFIRM THAT I WAIVE MY PRELIMINARY HEARING IN THE COURT OF COMMON PLEAS FOR A COPY OF THE POLICE REPORT AND FURTHER I AGREE THAT THE STATE CAN PROCEED IN THE SUPERIOR COURT BY THE FILING OF INFORMATIONS IN LIEU OF PRESENTING IT TO THE GRAND JURY FOR INDICTMENT.

Richard Thomas Miller
DEFENDANT

EXHIBIT
court
# A
92-12-00#4

A-1

was sentenced to a period of incarceration of twenty years.

Subsequently, the defendant filed a motion for postconviction

relief which was granted, and the defendant was allowed to

withdraw his guilty plea and proceed to trial on all charges.

Following a jury trial, the defendant was convicted on May 23,

1994 of unlawful sexual intercourse in the first degree and

burglary in the second degree. The defendant was sentenced to a

period of life imprisonment as to the sex offense and a period of

eight years as to the burglary. Following the defendant's

unsuccessful appeal, he filed the present motion with the Court.

### Ground One.
### "Not Signing or Waived Indictment"

There are no procedural bars. The defendant's claim alleges

a lack of jurisdiction due to the failure of his case to be

prosecuted by way of indictment.

The defendant was prosecuted by an information the

Department of Justice filed on December 28, 1992. On January 8,

1993, a written arraignment, pleading not guilty, was filed

pursuant to Rule 10(c). Mr. Miller and his attorney executed

this by written pleading. A review of the Court's docket reveals

that an executed waiver of indictment was not filed with the

information. The Court should have picked up this error because

Superior Court Criminal Rule 7(b) requires that a felony crime be

prosecuted by indictment unless the defendant has waived

indictment in open Court or in writing. The issue: did Superior

Court have jurisdiction to try and subsequently sentence the

defendant? For the reasons stated below, I find that, by the

3

defendant's conduct, there was a de facto waiver of his right to be indicted and that the defect in the record should not result in this defendant having another trial.

## Applicable Rule

A criminal "offense within the exclusive jurisdiction of Superior Court other than a capital crime" must be prosecuted by indictment unless the indictment is waived and proceeds by information. Super. Ct. Crim. R. 7(a). The defendant may waive indictment and proceed by information after he or she has been advised of the nature of the charge and of his or her rights. Super. Ct. Crim. R. 7(b). Under the Delaware Superior Court Criminal Rules, the defendant may waive prosecution by indictment in writing or in open Court. Super. Ct. Crim. R. 7(b).

Pursuant to rule 61(g)(1), the record has been expanded. Pursuant to that Rule, the Court directed the Department of Justice, the Public Defender's Office and the contract attorney to review their files to determine if the defendant had executed any document evidencing his waiver of indictment in order to proceed by way of information. Additionally, the Court made inquiry as to what occurred at the defendant's preliminary hearing in the Court of Common Pleas.

On June 16, 1995, the contract attorney forwarded to the Court the original of a document the defendant executed while under the representation of the Public Defender's Office. It is dated December 3, 1992, which was the date of the defendant's preliminary hearing. The document states the following: "This

4

will confirm that I waive my preliminary hearing in the Court of
Common Pleas for a copy of the police report and further, I agree
that the State can proceed in Superior Court by the filing of
informations in lieu of presenting it to the Grand Jury for
indictment." At the signature line for the defendant, there is
the name of Richard Thomas Miller. On June 29, 1995, the Court
forwarded a copy of this document to the defendant.

    I note that the Court of Common Pleas records, and a
transcript of the proceedings below evidences, that the
defendant, through his attorney, waived his preliminary hearing.
This is consistent with the aforementioned document and is
consistent with the custom and practice of obtaining copies of
police reports by waiving preliminary hearing and proceeding by
way of information in lieu of indictment. Police reports are not
normally discoverable under Rule 16.

    On September 19, 1995, the Court held an evidentiary hearing
to determine: (1) if the defendant executed the aforementioned
waiver; (2) was the preliminary hearing and indictment, in fact,
waived for the police reports; and (3) did the defense receive
the reports pursuant to the waiver. At the September 19, 1995
hearing, the December 3, 1992 waiver document was introduced.
The public defender investigator specifically recalled meeting
with Mr. Miller and reviewing with him the aforementioned waiver
document. Additionally, two identical waiver documents involving
prior offenses were introduced from the public defender's file.
The defendant acknowledged having read the earlier waiver

5

documents and having signed them.  One of these prior offenses
ultimately was prosecuted by information in the Superior Court
and the defendant pled guilty to a burglary.  The public
defender's staff and attorneys testified they always review the
consequences of the waiver of preliminary hearing and grand jury
indictment with each defendant before advising the Court of
Common Pleas of a waiver.  Even though the defendant questions
whether or not he executed the waiver document dated December 3,
1992, I am satisfied he did based upon the investigator's
testimony, the defendant's acknowledgement that it looks like his
signature, and my comparison of the other documents containing
the defendant's signature to the waiver document in question.

    Subsequent to the filing of the charging document, the
information, the defendant (i) filed a written arraignment
entering a plea of not guilty and requesting a jury trial; (ii)
entered a plea of guilty and withdrew same for reasons other than
jurisdiction; (iii) went to trial and was convicted; and (iv)
appealed his conviction.

    It is apparent that Mr. Miller, his public defender, his
contract attorney, the Department of Justice and the Court
operated under the assumption that a waiver of indictment had
been filed.

    I am satisfied that the records of the Court of Common
Pleas, the executed December 3, 1992 waiver document, and the
testimony of his then assigned attorneys establish that the
defendant waived his right to a preliminary hearing and Grand

6

Jury indictment in order to obtain a copy of the police report which would not have been obtainable to him through Rule 16 discovery. Because of that waiver, he obtained the police reports. Following same, the case was processed by his attorneys, the Department of Justice, the Court of Common Pleas and the Prothonotary with the understanding that the case would be tried by way of information. A written waiver document has now been produced and filed with the Court.

Based upon the defendant's earlier experience with the criminal justice system and his execution of documents waiving his right to grand jury indictment twice prior to the present case, I find that he knowingly, voluntarily and intelligently waived his right to grand jury indictment by the agreement he reached with the State to obtain copies of the police report. This occurred on December 3, 1992.

The Superior Court's file now contains that document. While it is admittedly a tardy filing it firmly establishes that this defendant knew of and agreed to prosecution by information.

I further find that the defendant acquiesced to the jurisdiction of this Court by participating in all phases of the prosecution from his Rule 10 arraignment through the filing of his appeal.

Under these facts and circumstances, I find that the defendant waived his right to be prosecuted by indictment and submitted himself to the jurisdiction of this Court. I find that the failure to obtain the express waiver was a technical

7

violation which did not deprive the Court of jurisdiction.
Ornelas v. United States, 11th Cir., 840 F.2d 890 (1988).  Under
these facts, the failure to formalize same should not be a ground
for a new trial.

### Ground Two.
### "Bail being raised for same offense"

The defendant argues that his bond was raised following his
initial postconviction proceedings.

This allegation is barred pursuant Rule 61(i)(3) in that the
defendant has not provided any excuse as to why this matter was
not asserted in the proceedings leading to his conviction,
including the appeal, nor has he shown any prejudice arising from
the alleged violation.

As to the merits, the defendant's bond had nothing to do
with his conviction. Collateral matters not contributing to the
conviction  cannot provide relief from the conviction under Rule
61.

### Ground Three.
### "I signed and requested a non-jury trial."

The defendant alleges his rights were violated because he
did not want a jury trial.  He also argues bias and prejudice on
the part of the jury.

Initially, the defendant was scheduled for a jury trial.
Then the aforementioned events concerning the Robinson plea and
the withdrawal of same occurred.

Later, when his case was scheduled for trial, the defendant
indicated his desire to waive a jury trial.  At first, the State

8



SUPERIOR COURT CRIMINAL DOCKET                Page   14
( as of  10/13/2004 )

State of Delaware v.  THOMAS R MILLER                    DOB: 03/25/1958
State's Atty: JAMES W ADKINS , Esq.         AKA:
Defense Atty: ROSEMARY B BEAUREGARD , Esq.

```
      Event
No.   Date          Event                          Judge
------------------------------------------------------------------------
      FILED BY DEF. (SA)
104   11/07/1994
      LETTER
      TO JUDGE GRAVES FROM ROSEMARY
      BEAUREGARD RE:  RICHARD THOMAS
      MILLER BRIEF.   (LM)
105   12/16/1994
      LETTER
      TO COURT, FROM DEF. (MB)
106   05/24/1995
      MOTION FOR POST-CONVICTION RELIEF
      POST CONVICTION RELIEF MOTION # 1
      FILED BY DEF. (SA)
107   05/24/1995
      LETTER FROM DEFENDANT
      TO JUDGE REQUESTING THAT ROSEMARY
      BEAUREGARD BE ALLOWED TO REPRESEN
      DEF ON PCR MOTION (SA)
108   06/01/1995
      LETTER
      FROM SUPREME COURT ENCLOSING
      RECORD AND MANDATE ON CASE (SA)
109   06/01/1995
      MANDATE AFFIRMED
      ORDER SIGNED 5/9/95 BY JUSTICE
      HARTNETT. (SA)
110   06/16/1995
      WAIVER OF INDICTMENT SIGNED BY DEFT.
      /WAIVER OF PRELIMINARY HEARING
      SIGNED BY DEFENDANT ON 12/3/92.
      (LM)
111   06/16/1995
      LETTER
      TO JUDGE GRAVES FROM ROSEMARY
      BEAUREGARD RE:  ENCLOSING ORIGIN-
      AL WAIVER OF PRELIMINARY HEARING
      (LM)
112   06/19/1995                          GRAVES T. HENLEY
      LETTER
      TO DEF. FROM COURT RE:  ADVISING
      DEF. THE UNFILED WAIVER WAS IN
      HIS ATTY.'S FILE AND ENCLOSING A
```

A-3

A-4

**SUPERIOR COURT**
OF THE
**STATE OF DELAWARE**

112

T. HENLEY GRAVES
JUDGE

P.O. BOX 746
COURTHOUSE
GEORGETOWN, DE 19947

92-12-0044

June 19, 1995

Mr. Richard Thomas Miller
Delaware Correctional Center
P. O. Box 500
Smyrna, DE 19977

Dear Mr. Miller:

I had my staff contact the Attorney General's Office, the Public Defender's Office and the contract attorney to determine if the unfiled waiver was in one of their files.

Per the attached, it was located.

Yours very truly,

T. Henley Graves

THG:kjt
Enclosure
xc: Prothonotary

CERTIFIED
AS A TRUE COPY
ATTEST
PROTHONOTARY
Per
CLERK

A-3

A. DEAN BETTS
ROSEMARY B. BEAUREGARD

*Betts & Beauregard, P.A.*

JUN 16

ATTORNEYS AT LAW
15 SOUTH RACE STREET
P.O. BOX 770
GEORGETOWN, DELAWARE 19947

TELE: (302) 856-7755
FAX: (302) 856-4975

June 16, 1995

The Honorable T. Henley Graves
Superior Court of Delaware
Sussex County Courthouse
Georgetown, DE 19947

**CERTIFIED
AS A TRUE COPY**
ATTEST
PROTHONOTARY
Per
CLERK

RE:   *State v. Richard Thomas Miller*

Dear Judge Graves:

Per your inquiry, enclosed please find the original Waiver of Preliminary
Hearing signed by the above captioned individual.

If you have any questions, please do not hesitate to contact me.

Very truly yours,

BETTS & BEAUREGARD, P.A.

Rosemary B. Beauregard

RBB/tec

A-3

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR SUSSEX COUNTY

| THE STATE OF DELAWARE | X | NOS. S92-12-0044 thru 0047 |
|---|---|---|
| vs. | X | I N F O R M A T I O N |
| THOMAS RICHARD MILLER I.D. #92S05488 | X | |
| | X | |

The Attorney General of the State of Delaware by information makes that THOMAS RICHARD MILLER did commit the following offenses, to-wit:

### COUNT 1 - UNLAWFUL SEXUAL INTERCOURSE IN THE FIRST DEGREE - FELONY - S92-12-0044

THOMAS RICHARD MILLER on or about the 29th day of November, 1992, in the County of Sussex, State of Delaware, did intentionally engage in sexual intercourse with another person, Martha B. Pederson, without her consent and the defendant was not the victim's voluntary social companion on the occasion of the crime and had not premitted him sexual intercourse within the previous 12 montsh, in violation of Title 11, Section 775(a)(2) of the Delaware Code.

### COUNT 2 - BURGLARY IN THE FIRST DEGREE - FELONY - S92-12-0045

THOMAS RICHARD MILLER on or about the 29th day of November, 1992, in the County of Sussex, State of Delaware, did knowingly enter unlawfully in a dwelling, at night, belonging to Martha M. Pederson, with the intent to commit a crime, Unlawful Sexual Intercourse in the First Degree, therein, and while in the dwelling, he caused physical injury to Martha M. Pederson who was not a participant in the crime, in violation of Title 11, Section 826(2) of the Delaware Code.

A-4

VA-B A-5

COUNT 3 - UNLAWFUL SEXUAL PENETRATION IN THE SECOND DEGREE -
FELONY - S92-12-0046

THOMAS RICHARD MILLER on or about the 29th day of November,
1992, in the County of Sussex, State of Delaware, did inten-
tionally place one or more fingers inside the vagina of Martha M.
Pederson, without her consent and during the commission of the
crime, he caused physical injury to said Martha M. Pederson,
in violation of Title 11, Section 771 of the Delaware Code.

KARL HALLER, ESQUIRE
Assistant Public Defender
Pine Street
Georgetown, Delaware

s/CHARLES M. OBERLY, III
ATTORNEY GENERAL


James W. Alkens
DEPUTY ATTORNEY GENERAL

DATED:

A-4

, IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THOMAS R, MILLER
      APPELLANT,

    V.

STATE OF DELAWARE
      APPELLEE.

Cr. A. NOS. S92-12-0044 thru -
S92-12-0047
1:08-CV-137(GMS)

APPENDIX TO OPENING BRIEF OF
GROUND TWO.

**FILED**

APR 1 1 2008

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

Thomas R. Miller
THOMAS R, MILLER
DCC 1181
PADDOCK RD.
SMYRNA, DEL 19977

DATED: April 9, 2008

Table 6: Citation to Appendix

Exhibit (B-1) one page supplement report. · · · · · · · · · · · · · · · · · · 1
Exhibit (B-2) search warrant application and affidavit. · · · · · · · · · · · · 1
Exhibit (B-3) one continuation sheet. · · · · · · · · · · · · · · · · · · · · 1
Exhibit (B-4) Front page of Police report Box 32 · · · · · · · · · · · · · · · 1
Exhibit (B-5) 3 page Hospital report. · · · · · · · · · · · · · · · · · · · · 1
Exhibit (B-6) one FBI Forensic analysis report. · · · · · · · · · · · · · · · · 1
Transcript page B-115 —————————————————— 2
Transcript page-2 —————————————————————— 2
351 A.2d 84 State v. Doe (Del. Super (1976) ————————— 2
Exhibit (B-7) one letter from Counsel Beauregard ———————— 3
Transcript page B-155 thru B-157 ——————————————— 3
Transcript page A-128, A-129 ———————————————— 3
Exhibit (B-8) one certified report ——————————————— 3
Transcript A-79, A-80 ——————————————————— 3
Mooney v. Holohan 294 U.S. 103,112, 55 S.C. 340, 341, 79 L.Ed 79 (1935) — 4
Transcript page B-27, 28, 32 and 33 —————————————— 4
Exhibit B-9 one statement sheet ——————————————— 4
Transcript page B-113 thru B-117 ——————————————— 5
Transcript page B-115 ——————————————————— 5
Deberry v. State Del. Supr, 45 A.2d 744 (1983) ————————— 5
Hammond v. State Del. Supr, 569 A.2d 81 (1989) ————————— 5
Arizona v. Youngblood 488 U.S. 51, 109 S.Ct 333, 102 L.Ed 2d 281 (1988) — 5
Bailey v. State Del. Supr, 521 A.2d 1069, 1090 (1987) ———————— 6
Transcript page B-113 ——————————————————— 6
Brady v. Maryland 83 S.Ct 1194 —————————————— 6
Exhibit (B-10) one certified juror sheet, one jury selection sheet ———— 7
Ibid n. 104, Johnson, Hartford Currant, March 20, 1990. ——————— 8
Transcript page B-190 thru B-203 ——————————————— 8
Transcript page B-197 ——————————————————— 8
State v. Markus cite as 683 A.2d 221 N.J. Super. A.D. (1996) ————— 9
Batson v. Kentucky cite as 106 S.Ct 1712 (1986), ———————— 10
Hughes v. State Del. Supr, 490 A.2d 1034 (1985) ————————— 10
In State v. Thomas 586 A.2d 250 (1991) ————————————— 10

Hughes v. State 437 A.2d 559 _____ 13

Sexton v. State, Del. Supr., 397 A.2d 540 (1979) _____ 13

Edwards v. state Del. Supr, 320 A.2d 701 (1974). _____ 13

Bennett v. State. 3 storey 36 Del. Supr., 164 A.2d 442, 446 (1960) ____ 13
11 397 A.2d at 544. _____ 13

Hooks v. State, Del. Supr, 416 A.2d 189 204 (1980) ____ . . . ___ - 13

State v. Mayberry NJ. Supr; _____ - 14

Justice Sutherland in Berger v. United States, 295 U.S. 78, 88, 55 S.ct. 629,   14-15
633, 79 L.Ed 1314 (1935) _____

Bennett v. State, Del. Supr, 3 storey 36, 164 A.2d 442, 446 (1960) ____ 15

Jenkins v. State Del. Supr; 413 A.2d 874 (1980) _____ 16

II

*Lewes*    B-1    **SUPPLEMENT REPORT**    6 COMPLAINT NO. 769218

| 5 PAGE | 3 DATE-TIME THIS REPORT | 1. V ☑ O ☐ | 7 NAME (LAST - FIRST - MIDDLE) (BUSINESS/FIRM NAME) |
|---|---|---|---|
| 1 of 1 | 113092 2105 | S ☐ RP ☐ | Pederson, Martha M |

| 23 DATE - TIME OF ORIGINAL INCIDENT | 12 ADDRESS | 84 ARREST NO. |
|---|---|---|
| Sun 113092 | ~~██████████████~~ | 9864 |

| 29 4-F-14 SENT | DATE | SUP SENT | 45 ADDITIONAL STOLEN | 59 OFFENSE CHANGED FROM | 27 SUPPLEMENT C. |
|---|---|---|---|---|---|
| YES ☐  NO ☑ | | YES ☑  NO ☐ | N/A | N/A | |

| 58 FOLLOW-UP ☑ ADD INFO ☐ | 44 RECOV STOLEN DATE | 46 ADDITIONAL RECOVERED | 25 CORRECT OFFENSE | 26 UCR CLASS |
|---|---|---|---|---|
| | N/A | N/A | Unlaw Sex Pen. T-11-772(1) | 1177-10 |

NARRATIVE: DO NOT REPEAT THE RESULTS OF THE PRELIMINARY INVESTIGATION REPORT. ALL ACTIONS TAKEN AND ALL DEVELOPMENTS IN THE CASE SINCE THE LAST REPORT, DESCRIBE AND RECORD THE VALUE OF RECOVERED PROPERTY. LIST THE NAME, RECORD NUMBER AND DESCRIPTION OF PERSONS ARRESTED. EXPLAIN CLASSIFICATION CHANGE. CLEARLY SHOW THE DISPOSITION OF RECOVERED PROPERTY.

CODE

25 | Unlawful sexual intercourse T-11 775(a)(2)
25 | Burglary T-11-826
25 | Criminal Trespass

At 1816 hrs writer excuted a search warrant signed by Judge Boddy @ J.P.Court #3. Writer pick-up def (Miller @ SCI and transported same to Beebe Medical Center in ref. to having samples of Hair, Salivia, and blood taken from the def (Miller) and sent to the F.B.I lab @ a later date and time for anybis. Dr. Angel MD., and Amy Register R.N. of Beebe Performed the combings and gatheri of evidence.

KARL HALLER, ESQUIR
Assistant Public Defend
Pine ____ Street
Georgetown, Delaware

| 52 REPORTING OFFICER | NO. | DIV. | 53 STATUS | | 54 EXCEPTIONAL CLEAR | |
|---|---|---|---|---|---|---|
| Ptlm B. Ritter | 9478 | 76U | ☐ UNFOUNDED  ☐ ARREST - JUV. | | ☐ DEATH SUSPECT  ☐ NO V COOPERATION | |
| 51 SUPERVISOR APPROVING | | | ☐ PENDING - ACTIVE  ☐ PEND-INACTIVE | | ☐ PROSECUTION DECLINED  ☐ JUV NO CUSTODY | |
| | | | ☑ ARREST - ADULT  ☐ SERVICE CLEAR | | ☐ EXTRADITION DECLINED  ☐ ADMIN SANCTION | |

| 56 SOLVABILITY FACTORS | ☐ WIT | ☐ MO. | ☐ EVIDENCE | ☐ TRAC. STOLEN | ☐ SUSP VEH ID'ED | 57 ☐ |
|---|---|---|---|---|---|---|
| ☐ SUSP. NAMED | ☐ SUSP. LOCATED | | ☐ SUSP DESCRIBED | ☐ SUSP ID'ED | | OFFICE  FOLLOW-UP  CLOSE |

DOC

*ller, Thomas K. B M In use...*
*-8 wt 148  Blk Hair Bro Eyes*  ) SS:
*ho committed unlawful*  )
*exual intercourse.*  )

SEARCH WARRANT
APPLICATION AND AFFIDAVIT

STATE OF DELAWARE
COUNTY OF __Sussex__

DATE OF APPLICATION
__11,30,92__

COMPLAINT NO.
__7692 1831__

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

NAME(S) OF AFFIANT(S):

__Ptlm Bruce Rittee__  OF __Lewes__  __Police__

OF _____

personally appeared before me, and being duly sworn(affirmed) according to
law, depose(s) and say(s) that there is probable cause to believe that
certain property is evidence of or the fruit of a crime or is contraband or
is unlawfully possessed or is otherwise subject to seizure, and is located
at particular premises or places or in the possession of particular person(s
as described below.

IDENTIFY ITEM(S) TO BE SEARCHED FOR AND SEIZED:

2- Containers of Blood, 1- seamen sample, 1- salivia sample, Samples of
head- hair, samples of pubic hair and finger nail samples

SPECIFIC DESCRIPTION OF PREMISES AND/OR PLACE(S) AND/OR VEHICLE(S) AND/OR
PERSON(S) TO BE SEARCHED:

The person of Thomas, Richard Millee B-M- 4/H- 032555  '-8 wt 14
Blk Hair and Bro Eyes  Soc. Sec. № 222-50- 3515

NAME OF OWNER(S), OCCUPANT(S) OR POSSESSOR(S) OF PREMISES AND/OR PLACE(S)
AND/OR VEHICLE(S) AND/OR PERSON(S) TO BE SEARCHED:

See above

VIOLATION OF(Describe conduct or specify statute):
Unlawful sexual penetration, unlawful sexual intercours, Burglary

PROBABLE CAUSE BELIEF IS BASED ON THE FACTS AND CIRCUMSTANCES SET FORTH
IN THE HEREIN ATTACHED "PROBABLE CAUSE SHEET" CONSISTING OF _____ PAGES

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

__Bruce Rittes__  OF __Lewes Police__  __9478__
(Signature of Affiant)                                          Badge/IBM No.

OF _____

SWORN TO AND SUBSCRIBED BEFORE ME, THIS __30th__ DAY OF __Nov.__, 19__92__

_____        __J. P. #3__
(Signature of Issuing Authority)        (Court)

**CONTINUATION SHEET**

| 5 PAGE | 6 COMPLAINT NO. | 52 INVESTIGATING OFFICER |
|--------|-----------------|--------------------------|
| 2 of 2 | 76-92-1831 | Cpl. Mifflin |

had been delivered and V. stated that the Def. had been in the residence for about a half an hour to forty five minutes.

Writer relayed the V. back to her residence once her examination was complete and made arrangemen for a resident to stay with same. Several attempts to contact family members were unsuccessful but th manager of the developement contacted writer at the V. residence and stated that she would continue to attempt to contact someone.

Writer obtained the clothing that the V. was wearing during the assault, bed linens, pillow cases, the tools that the Def. left behind and the Rape Kit that was completed at the hospital and place same in the evidence locker for processing.

DOC # 45-06-78/06/09    DSP-6017 (8/9

**CRIMINAL INVESTIGATION**

112992    Lewes    1 OF 6?    COMPLAINT NO. 7692 I 83 I

| 7 NAME (LAST, FIRST, MIDDLE) Peterson, Martha M | 8 RACE, SEX, EQ. AGE W F 4H 79 | 9 D.O.B. 050115 | 10 RESD PHONE UNK | 11 BUS PHONE UNK |

| 12 | 13 RESIDENT ☑ FUL ☐ NON ☐ UNK | 14 EMPLOYER/SCHOOL Retired |

LOCATION OF RESIDENCE ✓# 12

| 16 GRID 200 124 | 17 SECT 7! | 18 CTY S | 19 NO PREM N/A | 20 TYPE PREMISE Residental | 21 LOC CD |

| 22 REPORTED DAY Sun  DATE 112992  TIME 1730 | 23 OCCURRED DAY Sun  DATE 112992  TIME 1700 | TO DAY Sun  DATE 1129  TIME 1735 | 24 INVOLVEMENT ☐ ALCOHOL ☐ DRUGS ☐ COMPUTER |

| 25 CRIME OR INCIDENT TITLE & SECTION Unlawful Sexual Penetration T-11-772 (1) | 26 UCR CLASS 1122-10 | 27 SUP CODE | 28 CRIM ACTIVITY |

| 29 4-F-14 SENT ☐ YES ☒ NO N/A | 30 G.B. ☐ YES ☒ NO | 31 POINT OF ENTRY E/Side of Residence | 32 NATURE OF INJURIES NONE | 33 WEAPONS MEANS/ATTACK W |

INDICATE RELATIONSHIP TO INVESTIGATION: W-1, W-2 WITNESS,    NI NOT INTERVIEWED,    RP REPORTING PERSON,    P PARENT

| CODE | 34 NAME (L, F,M) | ADDRESS | PHONE |
| KI | | UNK | UNK |
| W-1 | Bunting, Paela | Stockley, Georgetown, DE | UNK |
| W-2 | Wright, James B.M. W/H 100521 | Apt 8 Haliling Code Lewes | 645-5187 |

| 35 OTHER EVIDENCE | TYPE Photographs, Sexual Assault Kit, Clothing Articles |

METHOD OF OPERATION: Def entered vic residence without consent, and had sexual intercourse with vic while holding vic down.    MO. CLAS

| 37-1 ☐ SUSPECT ☑ DEFENDANT (L, F,M) Miller Thomas Richard) | 37-2 TYPE ARREST ☐ ON ☐ SUMMOND/ VIEW ☐ W/ARRANT | 37-3 VO. | 37-4 RACE, SEX, EQ. AGE B M  W/H 39 | 37-5 D.O.B. 032658 | 37-6 RESIDENT ☐ FUL ☒ NON ☐ UNK |
| 37-7 ALT/ADDRESS 2- Shady Nook Trailer Prk | 37-8 DESCRIPTION 5-8 Ht 140 wt SS# 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 | | | | 37-9 ARMED WITH |

| 38-1 ☐ SUSPECT ☐ DEFENDANT | 38-2 TYPE ARREST ☐ ON ☐ SUMMOND/ VIEW ☐ W/ARRANT | 38-3 VO. | 38-4 RACE, SEX, EQ. AGE | 38-5 D.O.B. | 38-6 RESIDENT ☐ FUL ☐ NON ☐ UNK |
| 38-7 ADDRESS | 38-8 DESCRIPTION | | / | | 38-9 ARMED WITH |

| 39 VEH REG & STATE N/A | YEAR | MAKE | MODEL | BODY | COLOR(S) N/A | IDENTIFYING CHARACTERISTICS |

| PROPERTY TYPE | STOLEN - S, DAMAGED - D, RECOVERED - R, SEIZED - Y | TYPE | I.D. NUMBER | VALUE |
| 40-1 | | | | -0- |
| 40-2 | | | | |
| 40-3 | | | | |
| 40-4 | | | | |

| 41 DRUG TYPE N/A | 42 DRUG QUANTITY N/A | 43 DRUG MEASURE N/A | 44 DATE RECOVER'D N/A | 45 VALUE DAMG -0- | 46 VALUE REC -0- | 47 VALUE STOLEN -0- |

48 CONTINUATION OF ABOVE ITEMS

Unlawful Sexual intercourse T-11-775 (a)(2)  1125-11

5 Burglary T-11-826  2205=46

6 Criminal Trespassing T-11-823 ✓ 707-21

DR. Abel, M.D. Beebe Medical Center Lewes DE
Cpl. D. Mitflin (9475)
Cpl. G. Mansfield (9474)

| 49 DET NOTIFIED N/A | 50 REFERRED TO N/A | 51 SUPERVISOR APPROVAL |

| REPORTING OFFICER E. Kittle | BADGE 9476 | CITY 76U | 53 STATUS ☐ UNFOUNDED ☒ PENDING - ACTIVE ☐ ARREST - ADULT | 54 EXCEPTIONAL CLEAR ☐ ARREST - JUV. ☐ DEATH SUSPECT ☐ PEND - INACTIVE ☐ PROSECUTION DECLINED ☐ SERVICE CLEAR ☐ EXTRADITION DECLINED | ☐ NO V COOPERATN ☐ JUV NO CUSTODY ☐ ADMIN SANCTION |
| INVESTIGATING OFFICER & SIGNATURE D.N.O. | | | | |

| QUALIFYING FACTORS ☐ WIT ☐ MO | ☐ EVIDENCE ☐ SUSP LOCATED | ☐ TRAC STOLEN ☐ SUSP DESCRIBED | ☐ SUSP VEH ID'ED ☐ SUSP ID'ED | 57 ☐ OFFICE FOLLOW-UP ☐ CLOSE |

DOC. # 45-06-78/06/06    DSP 7014 (R/77)

CRIMINAL INVESTIGATION    (Exhibit A-9)



```
202 020 562 11/29 92
REDERSON, MARTHA M          F
170.715   AY 3763745
CR. E.D. PHYS   FAM.DR-

14 ROLING COVE        19994
LEWES, DE        000 000 0000
```

Lewes, Delaware 19958
(302) 645-3251

11 29 92

**BEEBE EMERGENCY CENTER**
Route 26 (Three miles West of Canal Bridge)
Millville, Delaware 19945-(302) 539-8450

**BEEBE
MEDICAL
CENTER**

**INSTRUCTIONS TO THE PATIENT:** The examination and treatment you have received in the Emergency Department have been rendered on an emergency basis only, and is not intended to be a substitute for or an effort to provide complete medical care. Because it is impossible to recognize and treat all elements of injury or illness in a single Emergency Department visit, it is important that you let your follow-up doctor check you again, and that you report to him any new or remaining problems at that time. X-rays and electrocardiograms interpreted initially by the Emergency Department physician will be officially read by the appropriate specialist. If there is a difference you will be notified. Meanwhile, follow instructions as indicated below.

### ☐ CUTS ABRASIONS OR BURNS

___1. Keep cut or stitches clean, dry and covered.
___2. See your doctor for any of the following signs of infection: swelling, red streaking, drainage or pus, or fluid, severe or persistent pain or fever.
___3. Make an appointment with your doctor to have stitches removed or wound examined in _____ days.
___4. Change the bandage after 24-48 hours and as necessary thereafter.
___5. Do not remove bandage until seen by your doctor.
___6. Stitches will absorb and do not need to be removed.
___7. You have been given a booster dose of tetanus toxoid. These boosters are given routinely now every 5 years, or by special order of a doctor.

### ☐ HEAD INJURY

___1. Notify your doctor immediately for any of the following:
   a. Eyes that move independently or pupils that are unequal in size.
   b. Bizarre behavior, change in walking patterns, weakness or numbness in arms or legs.
   c. Persistant vomiting or high fever.
   d. Unusual drowsiness, persistent headache or dizziness.
   e. Bleeding or discharge from ears or nose.
   f. Loss of consciousness or convulsions

**NOTE: Waken patient hourly for the first 12 hours to check for these signs.**

### ☐ CULTURES

___1. If throat culture is positive, you will be notified.
___2. For all other cultures you will be notified if treatment needs to be changed.

### ☐ SPRAINS OR SOFT TISSUE INJURIES

___1. Elevate the injuried part to reduce pain and diminish swelling for _____ day(s).
___2. Use ice packs or cold compresses for _____ day(s).
___3. Use heat in the form of hot soaks, hot compresses, hot water bottle or heating pad (10w heat) for 20 minutes every 2-4 hours after _____ day(s).
___4. Keep the elastic bandage or sling on for _____ days or until pain is relieved. You may remove and rewrap it as necessary. Be sure that it is snug, but not tight. Remove during rest.
___5. Notify your doctor immediately if the injured area becomes discolored, cold or numb.
___6. Use crutches for support for _____ days.
___7. Restrict activity of injured area for _____ days.

### ☐ FEVER TREATMENT

___1. Drink plenty of fluids.
___2. Bed rest for _____ days.
___3. Take _____ aspirin and/or _____ tylenol every _____ hours.
___4. Take temperature every _____ hours.
___5. Light diet (soups, jello, clear liquids) for _____ day(s).
___6. Sponge bathe with tepid water for temperature of 104 or more.

### ☐ BACK OR NECK INJURY

___1. Use heat or cold on the injured area whichever seems to help the most.
___2. Bed rest for _____ days, or until improved.
___3. Avoid positions and movements that make the pain worse.
___4. Gentle but firm massage will help clear the soreness

### ☐ CAST CARE

___1. Cast will be damp for 24 hours. Do not apply pressure or bear weight during this period.
___2. Keep elevated for 24 hours.
___3. Call your physician or return to Emergency Department for the following:
   a. Severe pain or pressure in cast.
   b. Increasing numbness or coldness of fingers/toes.
   c. Excessive swelling.
   d. Bluish color of nails.
___4. Don't walk on cast.
___5. Don't remove padding or poke anything down cast

### ☐ GENERAL INSTRUCTIONS

X ___1. Make an appointment to see your doctor in _____ days or sooner if you feel worse.
___2. You may take aspirin or similar medication for pain
___3. Take prescription as directed.
___4. No school or work for _____ days.

**INSTRUCTIONS:** If your family physician has questions concerning your treatment he may contact the Emergency Department.

_____
_____

| E. R. Physician | Inst. Sheet Given By: | I acknowledge receipt of the above instructions. I understand that I have had emergency treatment only and that further evaluation and/or treatment may be necessary. |
|---|---|---|
| Attending Physician | | Patient Signature (Or Responsible Person) |

M--818A        9/89

```
5/01/15
D..E.E. PHTS
        . .  MG COVE
                          13958
                        000-0000
```

| | | | | | |
|---|---|---|---|---|---|
| **PATIENT NAME:** Peterson, Mary May | | | | **EMERGENCY ROOM** | |

**TRIAGE NURSE ASSESSMENT**   **PRIORITY** ☐ C  ☐ E  ☒ U  ☐ R1

| TIME | AGE | SEX | ACCOMPANIED BY | | TETANUS HX: | PRIMARY PHYS. |
|---|---|---|---|---|---|---|
| 1755 | 85 | ☐ M ☐ F | ☒ RESCUE ☐ SELF ☐ OTHER ☐ SPOUSE ☐ AMBULATORY ☐ FRIEND ☐ PARENT | | ☐ WITHIN 5 YRS ☐ NEVER ☐ OVER 5 YRS ☐ UNSURE | Saliba |

| TEMP. | PULSE | RESP | B/P | LMP | WT | ACCIDENT | ALLERGIES |
|---|---|---|---|---|---|---|---|
| 96.6 | 88 | 26 | 210/110 | | | ☐ HOME ☐ AUTO ☐ WORK ☐ MC | ∼ |

**GENERAL APPEARANCE**
COLOR ☐ NORMAL ☐ JAUNDICED ☐ PALE ☐ CYANOTIC ☐ NAIL BEDS ☒ FLUSHED ☐ CIRCUMORAL

SKIN ☐ WARM ☐ CLAMMY ☐ RASH ☐ DRY ☐ EDEMA ☐ OTHER ☒ COOL ☐ ECCHYMOSIS

**MENTAL STATUS**
☐ CONS. ☐ LETH. ☒ CONFUSED  disoriented
☐ UNCON ____ MIN. ☐ ORIENTED  YES ☐☐☐  NO ☐☐☐

**RESP**
☐ NORMAL ☒ RAPID ☐ STRIDOR
☐ SHALLOW ☐ SLOW ☐ AUDIBLE WHEEZE
☐ DEEP ☐ LABORED

PULSE:
☐ REGULAR ☐ WEAK
☒ IRREGULAR ☒ STRONG

VISUAL ACTIVITY (IF NEC.)  RIGHT EYE  LEFT EYE

**CHIEF COMPLAINT (MECHANISM OF INJURY)**
Pt. found in bed with no Pt. Cloths are pulled up
& underwear on. inmate beside Pt. on bed when
found. Pt. St. police in via heirs police

**ASSESSMENT OF CHIEF COMPLAINT**
Pt. disoriented & unable to answers questions @
this time.

**TREATMENT PRIOR TO ARRIVAL**
∅

**PMH**
Hypertension
NKA ∅

**CURRENT MEDS.**
triamterene / HCTZ 50mg/25mg qd.
Methyldopa 250mg tid.
hand in 0.25 mg qd.
Cipro 500 mg BID.

**TRIAGE INTERVENTION:** ☐ SPLINTS ☐ ST DRESSING ☐ ICE ☐ CERV. COLLAR ☐ LAB ☐ X-RAY ☐ OTHER

**REPEAT VS.**   **TRIAGE NURSE SIGNATURE**

**NURSING DIAGNOSIS**

☒ ANXIETY
___ BOWEL ELIMINATION, ALT. IN:
___ COMFORT, ALTERATION IN:
___ FLUID VOLUMES, ALT. IN:
___ GAS EXCHANGE, ALT. IN:
___ INFECTION, POTENTIAL / ACTUAL
___ URINARY ELIMINATION, ALT. IN:

___ NON-COMPLIANCE (SPECIFY)
___ PHYSICAL MOBILITY, IMPAIRED:
___ SENSORY / PERCEPTUAL ALT. IN:
___ (SPECIFY) VISUAL, AUDITORY,
GUSTATORY, TACTILE, OLFACTORY
___ SKIN INTEGRITY, IMPAIRED:
___ POTENTIAL FOR: (SPECIFY)

___ THERMOREGULATION, INEFFECTIVE:
___ THOUGHT PROCESS, ALT. IN:

___ TISSUE PERFUSION, ALT. IN:
(SPECIFY) RENAL, CEREBRAL,
CARDIOPULMONARY, PERIPHERAL
GASTROINTESTINAL.

OTHER:

| | GOAL EVAL | INIT. | KEY |
|---|---|---|---|
| | | | M = GOAL ME |
| | | | N = GOAL NO ME |
| | | | * = EVAL. IN NURSES NO |

**TIME IN TREATMENT AREA** 1755

**RN SIG.**

FORM NO. 1020
REV 8 91

B-83

MEDICAL RECORD

800 020 562

BEEBE MEDICAL CENTER

EMERGENCY RECORD                                        MED REC #: 800 020 562
REG DATE: 11/29/92   REG TIME: 18:16   DSCH TIME:       PRIOR ADM: 0/00/0

PT NAME   : PEDERSON, MARTHA M                          PHONE: 000-
PERM ADDR : 14 HULING COVE                LEWES, DE                    19958
TEMP ADDR :
BIRTH DATE : 5/01/15 AGE: 77Y SEX: F   M/S: S   TEMP PHONE:
BIRTH PLACE:                    RACE: W    SOCIAL SEC NO: 000000000
OCCUPATION :            EMPLOYER:                    REL:
PAT ACCT # : 3763745    LIVING WILL: N   PRIMARY PHYSICIAN:
                                         ADMITTED BY: BET
NEAREST RELATIVE:                        PHONE:   000-
       ADDR     :                                          00000
INSI NAME :               000 POLICY #:          GROUP.
INSI NAME :               POLICY #:              GROUP:
                                                          00000


**** AUTHORIZATION FOR EMERGENCY TREATMENT ****

1. THIS IS TO CERTIFY THAT THE UNDERSIGNED HEREBY CONSENTS TO AND AUTHORIZES
   THE ADMINISTRATION AND PERFORMANCE OF ALL DIAGNOSTIC PROCEDURES AND/OR SUCH
   MEDICAL, SURGICAL OR X-RAY TREATMENT, WHICH IN THE JUDGEMENT OF THE TREATING
   PHYSICIAN OR HIS AUTHORIZED AGENT MAY BE CONSIDERED NECESSARY OR ADVISABLE.

2. NO GUARANTEE HAS BEEN MADE AS A RESULT OF TREATMENTS OR EXAMINATION IN THE
   HOSPITAL.

3. THE UNDERSIGNED UNDERSTANDS THAT A PERSONAL PHYSICIAN IS TO BE SELECTED BY
   OR ON BEHALF OF THE PATIENT UPON ADMISSION IF HOSPITALIZATION OR FURTHER
   TREATMENT IS REQUIRED.

4. THE UNDERSIGNED HAS READ THE ABOVE AUTHORIZATION AND UNDERSTANDS THE SAME.


                              A.M.
DATE _____ TIME _____ P.M.     SIGNED _____
                                              PATIENT


WITNESS _____   OR _____
                                        AUTHORIZED PERSON


                                   RELATIONSHIP TO PATIENT _____


              AUTHORIZATION MUST BE SIGNED BY THE PATIENT,
              OR BY AN AUTHORIZED PERSON IN THE CASE OF
              A MINOR OR WHEN PATIENT IS PHYSICALLY OR
              MENTALLY INCOMPETENT.

818-5
Rev. 10/87

B-86

7-1 (Rev. 2-21-91)



# FEDERAL BUREAU OF INVESTIGATION
## WASHINGTON, D. C. 20535

Date:  June 9, 1993

To:  Mr. Jack Warrington
     City of Lewes
     Director of Public Safety
     Lewes Police Department          FBI File No. 95A-HQ-1042998
     Post Office Box 227
     Lewes, Delaware  19958           Lab No.  21231024 S WP RQ


Reference:  Communication dated December 30, 1992


Your No.  76-92-1831

Re:  THOMAS R. MILLER - SUSPECT;
     MARTHA M. PEDERSON - VICTIM;
     RAPE/BREAKING AND ENTERING




Specimens received:  December 31, 1992

Specimens personally delivered by Sergeant Steve Swain on
December 31, 1992:

ITEMS FROM VICTIM:

Q1-Q2     Vaginal swabs

Q3-Q4     Vaginal slides

Q5-Q6     Oral swabs

Q7-Q8     Oral slides

Q9        Genital swabbings

Q10       Pubic hair combings

Q11       Slip

Q12       Gown


Page 1                                          (over)

This Report Is Furnished For Official Use Only

*B-6*

Q13        T-shirt

K1        Blood sample from victim

K2        Head hair sample from victim

K3        Pubic hair sample from victim

ALSO SUBMITTED:

        Hospital report

ITEMS FROM SUSPECT:

Q14        Pubic hair combings

Q15        Shorts

K4        Blood sample from suspect

K5        Head hair sample from suspect

K6        Pubic hair sample from suspect

K7        Saliva sample from suspect

ITEMS FROM CRIME SCENE:

Q16-Q19    Four pillowcases

Q20        Sheet

Q21        Mattress cover

Result of examination:

        The known blood samples were grouped as follows:

| SPECIMEN(S) | RESULTS |
| --- | --- |
| K1 PEDERSON | "PGM 2+, Hp 1, Gc 1F-1S" |
| K4 MILLER | "Hp 2-1, Gc 1F" |

An attempt to further characterize specimen K4 was
inconclusive.

No blood or semen was found on specimens Q1 through Q9, Q11 or Q12.

No hairs like the pubic hairs of the suspect were found in specimen Q10.

No hairs like the pubic hairs of the victim were found in specimen Q14.

The hairs and fibers have been removed from the remainder of the submitted items and have been preserved for possible future comparison. In view of the fact that the suspect was arrested in the victim's bed with the victim, no further hair or fiber examinations are being conducted.

The submitted items will be temporarily retained in the FBI Laboratory until picked up by a representative of your office.

A. DEAN BETTS
ROSEMARY B. BEAUREGARD

*Betts & Beauregard, P.A.*

ATTORNEYS AT LAW
15 SOUTH RACE STREET
P.O. BOX 770
GEORGETOWN, DELAWARE 19947

TELE: (302) 856-7755
FAX: (302) 856-4975

January 18. 1994

Mr. Thomas Miller
Delaware Correctional Center
P. O. Box 500
Smyrna, DE  19977


Dear Thomas:

     I am in receipt of your letter dated January 13, 1994.
At this point and time, considering the comments you made in
this letter, I must assume that you believe that a fraud has
been committed upon you based on the fact that you believe
the transcripts supplied to you are not accurate transcripts
of the proceedings that took place before the court.  Is it
your position that somebody has made up what is transcribed
in these transcripts?  If that is your position, please advise
as to specifics.  Eileen Kimmel, who is the court reporter,
has attached a certificate to each of the transcipts indicating
that these were the true and accurate transcript of the
proceedings that took place on those dates.  Ms. Kimmel has
been a court reporter for many years with the Superior Court
and is sworn to accuracy in these reports.

     ' My understanding from your letter is that you felt that
the Robinson plea that was entered was tainted based on the
fact that you did not have an FBI report until the day of your
plea.  It is my understanding that the FBI report has found
that there was no evidence of semen presence on Mrs. Pederson
and therefore there is inconclusive evidence medically as to
whether penetration occurred.  Please be advised that an
inconclusive report does not indicate that you did not have
intercourse with Mrs. Pederson, it merely states there is nothing
medically evident to indicate that you did.  Once again it
comes down to your word against Mrs. Pederson's word.

     Basically it is your belief that the description of
the crime given by the prosecutor was inaccurate based on
information you had subsequently obtained.  If Mr. Barnett
was aware of the information you have spoken of prior to your
plea, and if he gave you false information which you relied
on to take that plea, then there maybe some basis for withdrawing
your plea.  At this point it would seem that everything you
have raised in your letter was information that was obtained
after the plea was entered either through contact by you with
Mrs. Pederson or by your counsellor with Mrs. Pederson.  Is
this a correct assumption on my part?



A-5

2

1                    P R O C E E D I N G S

2          MR. ADKINS:  Your Honor, the next case we

3   would like to take is State versus Richard T. Miller.

4   The Information is Thomas Richard Miller.

5          Mr. Miller is represented by Mr. Barnett.  We

6   have been able to enter into a Plea Agreement whereby it

7   is my understanding that the defendant will be pleading

8   guilty to a lesser-included offense of Count 1 of the

9   Information, which will be unlawful sexual intercourse

10  in the second degree.  He will also be pleading guilty

11  to Count 2, burglary in the first degree.  We will be

12  dropping the remaining charge, Count 2, unlawful sexual

13  penetration in the second degree.  We are asking for a

14  presentence investigation.  I tender to the Court the

15  original Plea Agreement signed by all parties.

16          THE COURT:  Place the defendant under oath.

17          (Whereupon, the defendant, THOMAS R. MILLER,

18      was duly sworn.)

19          MR. BARNETT:  Good morning.  The Court will

20  pardon my speech this morning.  I have an infected jaw,

21  and it is a little swollen.  So I will try to speak

22  clearly.

23          I went through the Plea Agreement which has

1     Q     Are you aware whether or not Dr. Angel

2   observed that and noted that?

3     (A)   I believe that Dr. Angel did note that he saw

4   a small laceration in that area.

5     Q     Did he note any bleeding in that area?

6     (A)   I don't know. I would have to read his

7   report.

8     Q   : Do you remember your testimony in another

9   proceeding yesterday --

10    (A) . Yes

11    (Q)   -- when you testified that, in fact, he had

12   not noted that bleeding?   LIED

13          MR. ADKINS:  May we approach, please?

14          THE COURT:  I am going to sustain the

15   objection.  If she wants to refresh her recollection

16   through documents, or things of that nature, she may do

17   so.

18          MR. ADKINS:  I prefer to approach.

19          (Whereupon, counsel approached the bench

20      and the following proceedings were had out of

21      the hearing of the jury:)

22          MR. ADKINS:  I do not know how this should be

23   handled, but I can tell you that this witness'

                    EILEEN G. KIMMEL
                    OFFICIAL COURT REPORTER

1  reluctance to say anything whatsoever about what the

2  doctor saw is because I instructed her today that that

3  whole side of the report is out and she cannot mention

4  it.  I told her she cannot mention it, and I know that

5  that is what she is struggling with right now.

6           THE COURT:  I will take the jury out and tell

7  her that it is cross-examination and that if she needs

8  to refer to any of those, she may do so.  And you are

9  going to take your risk if she answers something you do

10  not want.                    ✓ why shouldn't she

11           MR. ADKINS:  I also told her that she could

12  not say the words "sexual assault" or "rape kit".  So

13  she has a whole list of things that she is thinking she

14  is not supposed to say, pursuant to the Court's ruling,

15  and she is trying to decipher this as the questions

16  come.

17           THE COURT:  Let me ask you this.  What you

18  are trying to get in is that Dr. Angel's report does

19  not say any --

20           MS. BEAUREGARD:  Blood.  Which is consistent

21  with her report.

22           THE COURT:  I understand that.  But a report

23  unanswered.  I understand you are getting into that

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

B-157

1   area.

2           MS. BEAUREGARD:  My preference is to refresh

3   her memory based on her sworn testimony yesterday,

4   which I attempted.

5           THE COURT:  To refresh somebody's

6   recollection, you usually put something before them.

7           MR. ADKINS:  The last thing I want her to say

8   is, "I was told I couldn't say this in front of this

9   jury."  I do not need her to blurt that out.

10          (Whereupon, counsel returned to the trial

11      table and the following proceedings were had

12      in open court:)

13          THE COURT:  Ladies and gentlemen, I am going

14  to ask you to go in.  Do not even sit down.  If you go

15  in there and walk around the table twice, we will be

16  ready.

17          (Whereupon, the jury returned to the jury

18      room and the following proceedings  were had

19      in open court:)

20          THE COURT:  Counsel have basically made the

21  Court aware that based upon the rulings yesterday, you

22  have been advised not to say certain things, such as

23  the rape kit and to mention sexual assault.  The direct

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A-12

1  to the defendant, in the weighing and balancing, that there is

2  no need for you to have those characterizations.

3        MR. ADKINS:  In connection with that, Your Honor, I

4  stipulated to an F.B.I. report, basically that there was no

5  semen found, that type of thing, and I am not sure whether that

6  rape kit is mentioned in that.

7        THE COURT:  Well, the mentioning of that I don't have

8  a problem with, because that is the purpose of the rape kit,

9  for later analysis.  What I don't want in my ruling of what is

10  coming in as far as the historical hearsay, the rape kit to add
                     *no Physical evident Proof*

11  upon the significance of anything.  The State has already

12  agreed that the sexual assault diagnosis won't come in so I

13  guess the majority part of the door is open as to those areas

14  in Johnson, and Exhibit Number 1 as to my ruling under 403

15  limiting the introduction of 2, and I am only referring to the

16  top page of 2.  I haven't looked at anything else.  That is

17  what we have used.

18        Are we all on the same page?

19        MS. BEAUREGARD:  Your Honor, I think they did refer

20  to some times on Page --

21        THE COURT:  Times are fine, and things of that

22  nature.  Times are pertinent, times are relevant, they are

23  relevant to my ruling and relevant to the jury for purposes of

24  making a final determination.

A-129

1          And, Counsel, if you would like -- I haven't seen one

2   -- but if you want me to prepare an instruction concerning any

3   of these rulings you can consider it.  I am not saying I will,

4   I am not saying I won't.  I am just basically saying the Court

5   will entertain them, some cautionary instructions.

6          MS. BEAUREGARD:  Can we have some clarification as to

7   Document Number 1, Your Honor, and by that I am referring to

8   the rape kit.

9          THE COURT:  Yes.

10         MS. BEAUREGARD:  Your Honor has ruled that all of

11  that will be admissible --

12         THE COURT:  Except the title at the top.

13         MS. BEAUREGARD:  Except for the top part.  And that

14  is on the basis of a medical document, a medical record?

15         THE COURT:  It is based on the three hearsay

16  exceptions that I find firmly rooted, and that is 1, 2 and 4 of

17  803.
                          WAS NO-Penetration ITS NOT
18         I didn't get the exact time penetration is mentioned.

19  She said she took this immediately thereafter, and therefore I

20  think this is includable because the penetration would be

21  important medical diagnosis and treatment.  The fact that she

22  states these other things are more important to 1 and 2 as

23  opposed to medical treatment.

24         MS. BEAUREGARD:  Thank you for that clarification.
                                    NURSE REPORT

3-25-94
4:55 pm

Exhibit _____ B-1 _____ B-8

Court - reviewed - Counts relying
was prev. cited
by Counsel

reports made by
medical - admissable
court is satisfied evidence of qualified witnesses - subject to ability
that complying witness
Sister

Joint Exhibits 5:03 pm.
1 1 - Report - Rape Kit Beebe Hospital - except Top
2 - Report - ER - Beebe Hospital

Sexual Assault Form - not to go before Jury
Portion on left side of F

# 2 - Needs editing / white out
Document should not come in itself
just testimony

Rope Kit should not be mentioned

Sexual Assault Diagram - Not to come in

Motion to Dismiss to be heard
at 8:45 AM.

1    Court.

2            THE COURT:  Do you have the person who took that

3    medical record?

4            MR. ADKINS:  What we have, Your Honor, is registered

5    nurse, Lynn Morin, who has signed each of the handwritten pages

6    of this medical record.

7            On the first page, "Patient found in bed."

8    "Patient's clothes pulled up."  "No underwear on."  "Male

9    beside patient on bed when found by police."

10            THE COURT:  The pertinent question, Mr. Adkins, is

11    the hearsay coming from the complainant?

12            MR. ADKINS:  Okay.

13            THE COURT:  What was the mechanism where they are

14    getting this from?  Is he getting this from the police or

15    somewhere else?

16            MR. ADKINS:  I think the first page is from the

17    police.  I will drop my application on that.

18            THE COURT:  I think if you are going to consider it

19    under 4 you have to do it from her to a medical treater.

20            MR. ADKINS:  That is correct.

             ν BY THE DOCTOR.

21            The second page, this is in the left-hand column,

22    there is a quotation at the top, "I was raped."  From my

23    knowledge and information (this was actually handwritten by Dr.

24    Angel.  We tried to serve Dr. Angel but were unable to because

*NURSE WRITTEN REPORT*
*PROS. CURT.*

A-80

1  he has gone on a two and a half to three week continuing

2  medical education trip.  Dr. Angel is not here.  Lynn Morin,

3  who signed this medical document, registered nurse, she

4  actually heard Ms. Pederson say, "I was raped," because she was

5  there with the doctor the whole time.

6        The other note here of the doctor deals with, well,

7  for example, "Genitalia.  Superficial lacerations over

8  posterior fascia," which is the area between the vagina and the

9  rectum.  These notes, this handwriting, is actually Lynn    *-IED*

10  Morin's. *HEARSAY, SHE WRITTEN REPORT Herself*

11        This part saying, "Patient now more coherent, able to

12  explain what happened," --    *COURT DISCRETION*

13        THE COURT:  Mr. Adkins, I am going to cut you off.  I

14  think on this one, I am going to listen to the witnesses, see

15  if they stand the test of cross examination, and then make a

16  ruling on that.  That will take place outside of the jury.  I

17  am uncomfortable with the factual pattern that I have got right

18  now, as being able to make a ruling.  I would like to know the

19  circumstances, the emotional state of the declarant, and things

20  of that nature before making a decision on that.

21        MR. ADKINS:  May we do that prior to starting, call

22  this witness in for questioning?

23        THE COURT:  Well, we may as well let the jury go

24  then, it is 3:30, have them come back tomorrow, because it

1    much younger.  This person comes to No. 14 Huling Cove

2    and gets into that apartment with Miss Pederson

3    deceptively by saying that he is looking for someone

4    else.  He refuses to leave.  The dinner comes from the

5    Moose Lodge.  He takes the dinner.

6           Then he rolls Miss Pederson in the wheelchair

7    into the bedroom.  He has her in the bed with her

8    clothes pulled up, and he is completely naked, and he

9    penetrates her vagina with his penis.  That is that man

10   over there (indicating).  *PROSECUTOR LIED THIS WHOLE STATEMENT (REASON) POLICE AND nurse LIED SHE also written report.*

11          What are the charges in this case?  Count 1,

12   unlawful sexual intercourse in the first degree.

13          "Thomas Richard Miller, on or about 29th

14          day of November, 1992, in the County of Sussex,

15          State of Delaware, did intentionally engage in

16          sexual intercourse with another person, Martha

17          Pederson, without her consent, and the defendant

18          was not the victim's voluntary social companion

19          on the occasion of the crime and she had not

20          permitted him sexual intercourse on the previous

21          twelve months, in violation of Title 11, Section

22          775(a)(2) of the Delaware Code."

23          Count 2, burglary in the first degree:

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

LASER STOCK FORM B

THE CORBY GROUP 1-800-255-5040

B-28

1          "Thomas Richard Miller, on or about the 29th

2          day of November, 1992, in the County of Sussex,

3          State of Delaware, did knowingly enter unlawfully
                                              The time was 3:15 A.M.
4          in a dwelling at night belonging to Martha

5          Pederson with intent to commit a crime, unlawful

6          sexual intercourse in the first degree, while

7          therein, and while in the dwelling, he caused no
              Ohysical injury again he(pros)LIED
8          physical injury to Martha Pederson, who was not

9          a participant in the crime, in violation of Title

10          11, Section 826(2) of the Delaware Code."

11          The State is going to prove this to you

12     beyond a reasonable doubt, beyond any shadow of a
                  There's no evidence period, again LIED TO JURY
13     doubt, with overwhelming evidence.  We are going to

14     call the sister of Martha Pederson, Alice Bickling, to

15     the stand.  She is going to tell us how old Martha

16     Pederson was as of November 29th, and she is going to

17     tell us another fact.  She is going to tell us that her

18     sister did not survive to the date of this trial.  She

19     died on September 16, 1993.  But the prosecution did

20     not die.  The charges did not die.

21     again no    We are going to show you overwhelming
         evidence.
22     evidence, despite the fact that Miss Pederson is now

23     dead.  Miss Bickling will be able to tell you a little

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

LASER STOCK FORM B

THE CORBY GROUP  1-800-255-5040

B-32

1          She interviewed her for the purposes of

2     medical diagnosis and treatment and gathering

3     information for the doctor.  She helped examine her.

4     She saw a reddened area around Miss Pederson's neck.

5     She saw a small laceration in the -- I am not too good

6     with medical terms -- perirectal area.  Miss Morin will

7     be able to explain what that is.  An area in between

8     the vagina and the rectum.

9          She had to interview her about things like

10    penetration.  Miss Pederson told her that her vagina

11    was penetrated.  That is what sexual intercourse is,

12    penetration of the penis into the vagina.  It is

13    penetration, and that is what we have in this case.

14    There does not have to be ejaculation; just

15    penetration.

16         As a matter of fact, when Miss Morin was

17    interviewing Miss Pederson, she was asked about whether

18    there was ejaculation by that man (indicating).  She

19    said she was not sure about that.  Samples were taken

20    -- we will tell you this right up front -- and sent to

21    the F.B.I.  We are stipulating to an F.B.I. report in

22    this case.  There was no semen found on the vaginal

23    swabs.

LASER STOCK FORM B

THE CORBY GROUP 1-800-255-5040

1        But that is not pertinent to the fact of

2   whether there was penetration.  Miss Pederson said that

3   there was penetration.  He was practically caught in

4   the act.  That there is no semen makes no difference.

5   He did not get to the point of ejaculating semen,

6   apparently, into this lady's vagina.

7        As the Judge said, just use your common

8   sense, and at the end of this case, you will have no

9   doubt whatsoever that this man is guilty as charged of

10  both counts and that he violated this elderly lady in

11  the last years and in the calm and peace of her life.

12  Come back and send a message to him with a guilty

13  verdict that says, "Yes, we know beyond any reasonable

14  doubt that you did this despicable act." LEADING JURY
         WITH FALSE INFORMATION
15           Thank you.   (PROS) TELLING THEM TO FIND ME
                                 GUILTY BEFORE I'M TRIED

16           MS. BEAUREGARD:  I would reserve my right to

17  make my opening statement at the close of the State's

18  case.

19           THE COURT:  Ladies and gentlemen, what that

20  basically means is that both of the attorneys have the

21  opportunity to talk to you.  The defense has the

22  opportunity to talk with you at this point in time, or

23  they can wait until the end of the State's case and

LASER STOCK FORM B

THE CORBY GROUP 1-800-255-5040



PERSONAL/MARRIAGE/GROUPS/FAMILIES • CHILDREN/ADULTS • COURT EVALUATIONS • DIVORCE MEDIATION • HYPNOTHERAPY • TESTING
DRUG & ALCOHOL • WEIGHT CONTROL • SMOKING CLINIC • CAREER PLANNING • EMPLOYEE ASSISTANCE PROGRAMS • MOTIVATIONAL SEMINARS

 

# Greater Pottstown Counseling Service

**Pennsylvania Center**
P.O. Box 491, 1446 Farmington Avenue
Pottstown, PA 19464
(215) 323-1088

(A Non-Profit Organization)
**DIRECTOR**
Rev A. Smith, Sr. D Min

*"Perfect Love Casteth Out Fear" — I John 4:18b*

**Delaware Center**
P.O. Box 272, 337 Highway One
Lewes, Delaware 19958
(302) 645-6868

July 2nd, 1993

Mr. Charles Oberly, III.
Attorney General
State Office Building
820 N. French Street
Wilmington, Delaware 19801



RE: Thomas Miller

Dear Mr. Oberly:

I am writing to you again, because I have come to believe you are a fair man. I am beginning to believe that truth and justice are being over-looked in the effort to get a conviction. I feel it is the Attorney General's responsibility to prove people innocent as well as to prove them guilty. I feel truth is what needs to be found.

From my observations of some of the individuals who hold the position of Duputy Attorney General, they could care less about the truth. If an individual is charged, guilty or not, they are going to convict them. If they cannot convict them, they will keep them in prison for months longer than necessary to prove their point.

Thomas Miller, in my opinion, is one of these individuals who is not being treated fairly. Information was with-held from him until after he was sold in the court room a plea.

In the group therapy which I conduct, Thomas said he was not going to accept any plea because he was innocent. After his return from court, he said he was pressured and tricked by his own attorney and the AG into accepting a plea of ten years. After he accepted the plea, he was given his copy of the FBI Report, which said no evidence was found. Mr. Thomas is charged with rape and breaking and entering.

I did not know what to believe, so I called his victim on the phone. ███████████████████████████ He knocked on the door and she said, "Come in." Is that breaking and entering? A neighbor evidently called the police and this is when the charges began to multiply.

EXHIBIT  B9

EXHIBIT B-9

Charles M. Oberly, III, July 3, 1993, Page 2.


When I spoke with the victim, I said to her. Remember, this is suppose to be a rape victim. "Do you know they are giving Thomas Miller ten years in prison for what happen at your home." She said, "Oh no! That is too much." Did you ever hear a rape victim say ten years in prison was too much for a rape?

I then said to this so called victim. "How much time in prison do you think he should get?" She said, "He has had enough." I said, "What do you mean by that?" She said, "The time he has already spent in prison is enough." I said, "Do you think he should be set free?" She said, "Yes." This women, in my professional opinion was never raped.

I have written to Mr. James Adkins and requested his help. However, I will be surprised if I hear from him, unless you put pressure on him.

I am one of many citizens who are getting more and more concerned about how much "Justice" is in the Justice system. Some are suggesting a "Court Watch", where interested citizens monitor the court hearings and write reports on their fairness. I hope something can be done within the system itself.

Thank you for whatever you can do to get those who work from your office to seek truth more than a conviction.

Sincerely,

Roy A. Smith, Sr., D.Min., Ed.M.
Executive Director/Therapist


CC:    Judge William Swain Lee
       Thomas Miller
       File

B-113

1          AFTERNOON SESSION

2              (At 1:30 o'clock p.m., trial in the above-

3          entitled matter was reconvened in open court,

4          at the conclusion of the luncheon recess.)

5              MS. BEAUREGARD:   Your Honor, I have had an

6      opportunity to review the ten pages of police reports

7      that were not supplied to defense counsel pursuant to

8      the waiver of preliminary hearing agreement.  I have

9      had an opportunity to briefly skim the contents of

10     these documents, although I have not had an opportunity

11     to review them with Mr. Miller.

12              In reviewing these documents, certain

*POLICE WITHHolding evidence*

13     supplemental pages referred to a piece of evidence, in

14     particular, a pair of underwear, that was retrieved by

15     Patrolman Ritter in the sally port at S.C.I.  That

16     evidence was not supplied to me at the time I went out

17     to review the evidence last week, and it is my          *NO*

*evidence*

18     understanding that they cannot find that article of

19     clothing at this point.  I do not know what relevance

20     it is, except that this is an unlawful sexual inter-

21     course case and it is a piece of underwear, and I have

22     to assume that it has some relevance.

23              At this point, I am concerned that the

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

1    defense was not supplied with the reports in a timely

2    fashion, and I am concerned that there now appears to

3    be an article of clothing that is missing from the

4    evidence locker.  Based on my inability to effectively

5    review these documents --

6           THE COURT:  I will give you an opportunity.

7    We will advise the jury that matters have to be taken

8    up, and if they would like to take a walk around town,

9    rather than being in there for an hour, we will give

10   them a break for another hour.  The Court also wants a

11   copy of what was provided to defense counsel so the

12   Court can examine it.

13          MS. BEAUREGARD:  In connection with the

14   evidence, several copies that I have will not come out

15   on a copy machine.

16          THE COURT:  You look at whatever is available

17   to be read.  After you looked at it, give me a copy of

18   what there is.  If there is anything that is relevant

19   that I cannot read on there, I am sure you will point

20   that out to me.

21          As to the missing underwear, I will cross

22   that bridge when I come to it.  The State has

23   stipulated to that which is favorable.  In other words,

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

LASER STOCK FORM B

THE CORBY GROUP  1-800-255-5040

B-115

1    I think they stipulated that there was no semen. none

2         MS. BEAUREGARD:  The entire F.B.I. report.

3         THE COURT:  No semen was located.  That would

4    be the most favorable inference that could be deemed

5    for the defense.  In other words, if there was semen,

6    it could be potentially --  none

7         MS. BEAUREGARD:  Culpatory.

8         THE COURT:  If there is not semen, it is

9    exculpatory, and they are saying they cannot find any

10   semen.  You think about your position on that, and,

11   Mr. Adkins, you think about your position on that.  We

12   will go ahead and take an hour and let her digest

13   eleven pages.  It is not a one-page report.

14        MR. ADKINS:  There is one thing that you have

15   not been told so far.  Yes, there is one supplement

16   report that mentions, back on December 1st, Officer

17   Ritter's getting a call and going out to the prison and

18   getting this pair of briefs.  We can put him on the

19   stand maybe sometime during this hour.  This can all be

20   explained so that you know this underwear has nothing

21   to do with the case.  That is the first thing.  You

22   will know that the underwear has nothing to do with

23   this case. trying to set-up holding evidence.

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

LASER STOCK FORM B

THE CORBY GROUP  1-800-255-5040

1           Then secondly, the other ten pages -- and

2    Miss Beauregard can stand right here and correct me if

3    I am wrong -- all have to do with when Sergeant Swain.

4    "Sergeant Swain picked up the evidence and took it to

5    the F.B.I.  I went and got it to the F.B.I.  I took

6    Miss Pederson to the hospital and they took blood

7    samples."  There is nothing in these reports that has

8    any substance of any interview.  It is a chain of

9    custody.  That is why it should not take a full hour to

10   digest.

11          MS. BEAUREGARD:  I will take half an hour.

12   But I think I should have an opportunity to review it

13   with Mr. Miller.

14          THE COURT:  I think you should, too.  Now

15   that you know what it is, it is half an hour.  You let

16   me have a copy of it.  Deliver it to chambers.

17          Tell them that we are not going to get

18   started until 2:00 o'clock or maybe a little after.

19   Find out if they want sodas or whatever.  The State is

20   buying.  I do not mean Mr. Adkins.  I mean the State of

21   Delaware.

22          MR. ADKINS:  I also want to state for the

23   record, although I know this does not play a major part

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

1    in the Court's ruling at all, that these are reports

2    that the Attorney General's Office did not have in its

3    file whatsoever. The police with holding reports

     evidence

4              THE COURT:  I understand.  Thank you.

5              (Whereupon, a brief recess was taken, at

6         the conclusion of which the following proceed-

7         ings were had in open court:).

8              THE COURT:  Where are we?

9              MS. BEAUREGARD:  I had an opportunity to

10   review the documents with Mr. Miller.  They are pretty

11   much as Mr. Adkins has set forth, transporting and

12   collecting evidence, and such.  I believe we have had

13   an opportunity to review them, and I thank the Court

14   for letting Mr. Miller review those documents.

15             THE COURT:  All right, so we are starting

16   back then with the officer on the stand in cross-

17   examination; is that correct?

18             MS. BEAUREGARD:  Yes.

19             THE COURT:  Bring the jury in.

20             (Whereupon, the jury returned to the jury

21        box and the following proceedings were had in

22        open court:)

23             THE COURT:  Ladies and gentlemen, I

                    EILEEN G. KIMMEL
                  OFFICIAL COURT REPORTER

LASER STOCK FORM B

THE CORBY GROUP  1-800-255-5040

Ritter - Cross                                    B-118

1   apologize.  I know that it is a beautiful day out there

2   and you have those windows and you are looking out

3   there and you are stuck in here.  The only thing I can

4   do is basically say that it is not a big surprise,

5   because I told you at orientation that this would

6   happen.  It is the nature of the beast, especially in

7   criminal trials.  I apologize for the inconvenience to

8   you.

9              Ms. Beauregard?

10             MS. BEAUREGARD:  Thank you, Your Honor.

11                  CROSS-EXAMINATION (Cont'd))

12   BY MS. BEAUREGARD:

13        Q    I believe where we left off, Officer Ritter,

14   is I had asked you when your next contact was with

15   Miss Pederson after the 29th of November, and you had

16   testified that you thought it was sometime in December?

17        A    That is correct.

18        Q    You have had an opportunity to review your

19   report.  Can you state when that was?

20        A    Not the exact date, no, without walking back

21   over and looking at my report.

22        Q    Approximately when was it?

23        A    I believe it was the 10th.

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

LASER STOCK FORM B

THE CORBY GROUP  1-800-255-5040

Swain - Direct                              B-190

1            THE COURT:  Call your first witness.

2            MS. BEAUREGARD:  I would call Detective Steve

3    Swain to the stand.

4    Whereupon,

5                    STEVE T. SWAIN

6    was called as a witness by and on behalf of the

7    defendant and, having having been first duly sworn, was

8    examined and testified as follows:

9                    DIRECT EXAMINATION

10   BY MS. BEAUREGARD:

11        Q    Good afternoon, Detective Swain.  You are

12   employed by the Delaware State Police; is that correct?

13        A    Yes, I am.

14        Q    And in what capacity are you employed?

15        A    I am an evidence technician.

16        Q    And what exactly does an evidence technician

17   do?

18        A    Basically, I go to crime scenes and collect

19   evidence.

20        Q    Were you involved in the compiling of

21   evidence to be submitted to the Federal Bureau of

22   Investigation in regard to the case of State versus

23   Thomas R. Miller?

                    EILEEN G. KIMMEL
                    OFFICIAL COURT REPORTER

LASER STOCK FORM B

THE CORBY GROUP  1-800-255-5040

1        A    Yes, I was.

2        Q    And in what capacity were you involved in

3    that?

4        A    Officer Ritter came to my department and

5    asked for assistance.

6        Q    And did you assist him?

7        A    Yes, I did.

8        Q    And in what way did you assist him?

9        A    Basically, what I did, you know, I instructed

10   him what evidence should be taken to the F.B.I. Lab for

11   examination.

12       Q    And what did you instruct him?

13       A    All right, he brought several different items

14   over, and, basically, I took a look at it.  And the

15   items that I picked that he should take over were the

16   victim rape kit, and suspect kit, and some items of

17   clothing, and bed sheets, et cetera.

18       Q    What is included in these kits that you refer

19   to?

20       A    Basically, they can be swabbings that are

21   taken from the victim.  There can be hair cuttings,

22   hair pullings.  Things like that.

23       Q    And do you know what specific things were

                         EILEEN G. KIMMEL
                      OFFICIAL COURT REPORTER

B-2

1  taken in this case?

2      A    Well, the kit itself I looked at briefly.  I

3  am not exactly sure what was in it.

4      Q    I am going to ask you to look at this

5  document and tell me if you can identify it, and then I

6  will ask you if that helps refresh your memory as to

7  what was included in those kits?

8      A    Yes, it does.

9      Q    Can you tell the jury exactly what type of

10  evidence was gathered and watch type of evidence was

11  analyzed by the F.B.I.?

12      A    All right.  What was sent over was four sets

13  of vaginal slides.  That is where they take a swab and

14  put it on an actual glass slide and send it to the lab.

15  They also did the same thing orally to the victim and

16  genitally.  That is on the outside.  Also took pubic

17  hair combings.  That is where you collect suspect

18  combings and from the victim.  And the victim's slip, a

19  gown was sent, a tee-shirt, and then a blood sample

20  from the victim was also collected.  Additionally,

21  other blood samples with collected, too.

22      Q    And those samples, were they collected from

23  both Mrs. Pederson and Mr. Miller?

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

LASER STOCK FORM B

THE CORBY GROUP  1-800-255-5040

B-3

1        A      Yes, they were, and, also, there were head

2    hair samples and pubic hair samples.

3        Q      There was blood?

4        A      Yes.

5        Q      Head hair?

6        A      Yes.

7        Q      Pubic hair combings?

8        A      That's right.

9        Q      Saliva?

10        A      That's correct.

11        Q      Vaginal swabs?

12        A      That's right.

13        Q      Oral swabs?

14        A      Yes.

15        Q      And some articles of clothing?

16        A      That's correct.

17        Q      Why do you collect such evidence in a case

18    such as this, an unlawful sexual intercourse case?

19        A      Basically, when a sexual-type assault takes

20    place, there is a transfer of evidence, and that can be

21    blood, that can be semen, it can be hair, it can be

22    fibers.  A lot of times these things can be located and

23    identified to an particular suspect, particularly with

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

LASER STOCK FORM B

THE CORBY GROUP 1-800-255-5040

1   DNA testing.

2        .Q   So when you say "a transfer of evidence",

3   that means that hairs from one individual may get

4   transferred onto the other?

5        A    That's right.

6        Q    Did you submit these samples to the F.B.I.?

7   Did you transmit them yourself?

8        A    Yes, I did.

9        Q    And the results of the F.B.I. analysis, when

10   are they dated?

11       A    All right, the report here is dated June 9,

12   1993.

13       Q    Are you familiar with these types of results?

14   Have you dealt with those as an evidence technician in

15   your work?

16       A    Yes, I have.

17            MS. BEAUREGARD:  I guess I should have this

18   marked as a defense exhibit for identification.

19            MR. ADKINS:  No objection for it to go into

20   evidence.

21            THE COURT:  Defense Exhibit No. 1.

22            MS. BEAUREGARD:  I guess it would be No. 2.

23            THE COURT:  Whatever the next exhibit.

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

Swain - Direct                                   B-195

1              THE CLERK:  Admitted as Defendant's Exhibit

2    No. 1.

3                             (A document was marked as

4                             Defendant's Exhibit No. 1 and

5                             was admitted into evidence.)

6    BY MS. BEAUREGARD:

7         Q    I believe I had asked you if you know how to

8    read the results of these tests?

9         A    Yes, I do.

10        Q    If you can turn to the second page of this

11   report, at the bottom of that page, where it has

12   "Result of Examination".  Would you please interpret

13   what that means?

14        A    It says down here, "The known blood samples

15   were grouped as follows:  K-1, Pederson," and she has a

16   different blood profile there.  That is basically

17   standard serology, which each one of them means, I

18   don't particularly know.  But they are definitely

19   different here.  These are not DNA comparisons.

20        Q    These are just blood types, blood samples?

21        A    Right.

22        Q    And what was the conclusion of the testing of

23   the F.B.I. in regard to the blood samples?

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

B-6

LASER STOCK FORM B

THE CORBY GROUP 1-800-255-5040

1        A      Basically, they said no blood or semen was

2    found in Specimens Q-1 to Q-9, and Q-1 to Q-9 were all

3    vaginal swabs or oral swabs. the swabbings.

4        Q      So based on your terminology, a transfer of

5    evidence, based on these tests, none of that evidence

6    transferred onto the samples that were submitted to the

7    F.B.I.?

8        A      There is no blood or semen located.

9        Q      How about Q-10, which are the pubic hair

10   combings?

11       A      There was also no pubic hairs of suspect

12   found in Specimen Q-10.

13       Q      Specimen Q-10 are specimens of pubic hairs of

14   Mrs. Pederson; is that correct?

15       A      Yes, that's correct.

16       Q      Likewise, the next line, what were the

17   findings on the next line?

18       A      "No hairs like the pubic hairs of the victim

19   were found in Specimen Q-14."  That would have been

20   from the defendant.

21       Q      So, again, there was no transfer of that

22   particular type of evidence on the sample submitted?

23       A      That's right.

                      EILEEN G. KIMMEL
                   OFFICIAL COURT REPORTER

Swain – Direct                    B-197

1    Q    Is there any indication on this report as to

2    whether or not the head hairs from Mrs. Pederson or

3    Mr. Miller were analyzed or found?

4    A    It basically says here, "In view of the fact

5    that the suspect was arrested in the victim's bed with

6    the victim, no further hair or fiber examinations are

7    being conducted."

8    Q    So, basically, that means that, "We are not

9    going to conduct any further investigation, other than

10   what we have done above"?

11   A    That's correct.

12   Q    So all of the specimens that the F.B.I. chose

13   to examine, pubic hair combings from both Mr. Miller

14   and Miss Pederson and the search for blood or semen,

15   all of those came back negative; is that correct?

16   A    That's correct.

17   Q    You made a statement earlier that a lot of

18   times in a case like this there is a transfer of

19   evidence?

20   A    I am just going by all the cases I am

21   involved in.  There is a lot of times when there is

22   not.

23   Q    So sometimes there is and sometimes there is

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

LASER STOCK FORM B

THE CORBY GROUP 1-800-255-5040

Swain – Direct                    B-197

1   Q    Is there any indication on this report as to

2   whether or not the head hairs from Mrs. Pederson or

3   Mr. Miller were analyzed or found?

4   A    It basically says here, "In view of the fact

5   that the suspect was arrested in the victim's bed with

6   the victim, no further hair or fiber examinations are

7   being conducted."

8   Q    So, basically, that means that, "We are not

9   going to conduct any further investigation, other than

10  what we have done above"?

11  A    That's correct.

12  Q    So all of the specimens that the F.B.I. chose

13  to examine, pubic hair combings from both Mr. Miller

14  and Miss Pederson and the search for blood or semen,

15  all of those came back negative; is that correct?

16  A    That's correct.

17  Q    You made a statement earlier that a lot of

18  times in a case like this there is a transfer of

19  evidence?

20  A    I am just going by all the cases I am

21  involved in.  There is a lot of times when there is

22  not.

23  Q    So sometimes there is and sometimes there is

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

LASER STOCK FORM B

THE CORBY GROUP  1-800-255-6040

$B-8$

Swain - Cross                                    B-198

1   not, or a lot of times there is?  I guess I am asking

2   you to interpret.

3        A    It just depends upon what extent the activity

4   continued, how long.  The longer it occurred, the more

5   evidence you would have.

6        Q    Based on the F.B.I. report that you have just

7   testified from, there is no objective evidence, as far

8   as the samples submitted, that would indicate that any

9   contact occurred?

10       A    By "objective" do you mean -- you said

11   "objective evidence".  What do you mean?

12       Q    Objective as samples that were submitted, the

13   hair fibers and those types of things?

14       A    There was none located to connect, that's

15   correct.

16            MS. BEAUREGARD:  Your Honor, I have nothing

17   further of this witness.

18                      CROSS-EXAMINATION

19   BY MR. ADKINS:

20       Q    Good afternoon, Detective Swain.

21       A    Good afternoon.

22       Q    You said the longer the activity occurs, the

23   more chance that you might be able to get some

                    EILEEN G. KIMMEL
                 OFFICIAL COURT REPORTER

Swain - Cross                          B-198

1   not, or a lot of times there is?  I guess I am asking

2   you to interpret.

3         A     It just depends upon what extent the activity

4   continued, how long.  The longer it occurred, the more

5   evidence you would have.

6         Q     Based on the F.B.I. report that you have just

7   testified from, there is no objective evidence, as far

8   as the samples submitted, that would indicate that any

9   contact occurred?

10        A     By "objective" do you mean -- you said

11  "objective evidence".  What do you mean?

12        Q     Objective as samples that were submitted, the

13  hair fibers and those types of things?

14        A     There was none located to connect, that's

15  correct.

16              MS. BEAUREGARD:  Your Honor, I have nothing

17  further of this witness.

18                     CROSS-EXAMINATION

19  BY MR. ADKINS:

20        Q     Good afternoon, Detective Swain.

21        A     Good afternoon.

22        Q     You said the longer the activity occurs, the

23  more chance that you might be able to get some

                    EILEEN G. KIMMEL
                 OFFICIAL COURT REPORTER

LASER STOCK FORM B

THE CORBY GROUP 1-800-255-5040

1   evidence?

2        A    That's correct.  With two rubbing up against

3   each other, you have more hair and fiber exchange.

4        Q    Where do you get fiber exchange?

5        A    Well, from clothing.  But if they are nude,

6   they won't.

7        Q    That is what I mean.  How about if the person

8   is totally naked?  Why would you expect to have a fiber

9   transfer?

10       A    Well, you wouldn't.

11       Q    You went through these items that went to the

12   F.B.I., Q-1 through Q-9.  Oral swabbings are four of

13   these items, aren't they, Q-5, Q-6, Q-7, and Q-8?

14       A    That's correct.

15       Q    If this happens to be a case where there is

16   not even the slightest indication that there was

17   anything done orally, no penis put in anybody's mouth,

18   why would you expect to have any positive type of

19   evidence from an oral swab?

20       A    You wouldn't.

21       Q    No blood was found.  On vaginal swabbings and

22   slides, what kinds of blood would you be looking for as

23   an investigator and evidence technician for that type

LASER STOCK FORM B

THE CORBY GROUP  1-800-255-5040

Swain - Cross                          B-199

1    evidence?

2        A    That's correct.  With two rubbing up against

3    each other, you have more hair and fiber exchange.

4        Q    Where do you get fiber exchange?

5        A    Well, from clothing.  But if they are nude,

6    they won't.

7        Q    That is what I mean.  How about if the person

8    is totally naked?  Why would you expect to have a fiber

9    transfer?

10       A    Well, you wouldn't.

11       Q    You went through these items that went to the

12   F.B.I., Q-1 through Q-9.  Oral swabbings are four of

13   these items, aren't they, Q-5, Q-6, Q-7, and Q-8?

14       A    That's correct.

15       Q    If this happens to be a case where there is

16   not even the slightest indication that there was

17   anything done orally, no penis put in anybody's mouth,

18   why would you expect to have any positive type of

19   evidence from an oral swab?

20       A    You wouldn't.

21       Q    No blood was found.  On vaginal swabbings and

22   slides, what kinds of blood would you be looking for as

23   an investigator and evidence technician for that type

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

Swain - Cross                                    B-200

1   of person?  What type of blood would you be looking to

2   find from a vaginal swabbing, for example, from

3   Miss Pederson?

4        A    Well, it could be from injury.

5        Q    Or how about from the defendant?

6        A    That could be possible, too.

7        Q    If there is no evidence that the defendant's

8   penis is bleeding, would you expect to find blood on a

9   vaginal swab?

10       A    No, you would not.

11       Q    And if the penetration occurs for only a

12  short period of time and there is no ejaculation by the

13  male, would you expect to see any semen on vaginal

14  swabbings?

15       A    As long as no ejaculation occurred, you would

16  not.

17       Q    Does the absence of semen mean there is no

18  penetration?

19       A    No.  Penetration can occur without

20  ejaculation, of course.

21       Q    So there is not this, "No semen; no

22  penetration"?

23       A    That's right.

                    EILEEN G. KIMMEL
                 OFFICIAL COURT REPORTER

LASER STOCK FORM B

THE CORBY GROUP 1-800-255-5040

Swain -- Cross                                    B-200

1    of person?  What type of blood would you be looking to

2    find from a vaginal swabbing, for example, from

3    Miss Pederson?

4         A    Well, it could be from injury.

5         Q    Or how about from the defendant?

6         A    That could be possible, too.

7         Q    If there is no evidence that the defendant's

8    penis is bleeding, would you expect to find blood on a

9    vaginal swab?

10        A    No, you would not.

11        Q    And if the penetration occurs for only a

12   short period of time and there is no ejaculation by the

13   male, would you expect to see any semen on vaginal

14   swabbings?

15        A    As long as no ejaculation occurred, you would

16   not.

17        Q    Does the absence of semen mean there is no

18   penetration?

19        A    No.  Penetration can occur without

20   ejaculation, of course.

21        Q    So there is not this, "No semen; no

22   penetration"?

23        A    That's right.

                        EILEEN G. KIMMEL
                     OFFICIAL COURT REPORTER

Swain - Cross                          B-201

1      Q    No semen or ejaculation; is that right?

2      A    Right.

3      Q    Is there always hair transfers in sexual

4  intercourse cases?

5      A    Frequently, we do not get any match at all,

6  and then, of course, like I said, a lot of times we do.

7  But it can go either way.

8           THE COURT:  The Court would rather rest on

9  the facts of the case and not probabilities.

10  BY MR. ADKINS:

11      Q    When the F.B.I. report states, "No hairs like

12  the pubic hairs of the suspect were found in Specimen

13  Q-10," which is pubic hair combings from the victim,

14  does that just mean that they were not able to come up

15  with any of his pubic hair in the particular spot where

16  they combed her pubic hair?

17      A    That's right.

18      Q    And wouldn't they have to have loose pubic

19  hair in the beginning for it to transfer?

20      A    It could be loose hairs or hairs that are

21  getting ready to fall out.

22      Q    These pubic hair combings, is the whole area

23  of the pubic hair combed?

Swain – Cross                                    B-201

1        Q       No semen or ejaculation; is that right?

2        A       Right.

3        Q       Is there always hair transfers in sexual

4    intercourse cases?

5        A       Frequently, we do not get any match at all,

6    and then, of course, like I said, a lot of times we do.

7    But it can go either way.

8                THE COURT:   The Court would rather rest on

9    the facts of the case and not probabilities.

10   BY MR. ADKINS:

11       Q       When the F.B.I. report states, "No hairs like

12   the pubic hairs of the suspect were found in Specimen

13   Q-10," which is pubic hair combings from the victim,

14   does that just mean that they were not able to come up

15   with any of his pubic hair in the particular spot where

16   they combed her pubic hair?

17       A       That's right.

18       Q       And wouldn't they have to have loose pubic

19   hair in the beginning for it to transfer?

20       A       It could be loose hairs or hairs that are

21   getting ready to fall out.

22       Q       These pubic hair combings, is the whole area

23   of the pubic hair combed?

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

LASER STOCK FORM B

THE CORBY GROUP  1-800-255-5040

Swain - Redirect                    B-202

1      A    Well, if you do it right, it should be.  I

2  didn't collect the samples.

3      Q    You do not know what area was being taken in

4  this sample or combed in this case, do you?

5      A    That's right.  So I don't know if it was done

6  right or not.

7           MR. ADKINS:  No further questions.

8           THE COURT:  Any redirect?

9                 REDIRECT EXAMINATION

10 BY MS. BEAUREGARD:

11     Q    You did not personally observe the taking of

12 the samples in this case; is that correct?

13     A    That's correct.

14     Q    And you have stated that proper procedure on

15 the pubic hair combings would be to comb the whole

16 area?

17     A    That's right.

18     Q    Have you ever used Beebe Hospital in your

19 investigations in regard to taking these samples?

20     A    See, a physician actually examines the female

21 victim.  I don't get involved in that.

22     Q    So you have never been involved in a case

23 where Beebe Hospital had been involved in taking

                    EILEEN G. KIMMEL
                 OFFICIAL COURT REPORTER

1   samples?

2        A    I am involved in cases where a victim is

3   examined at Beebe Hospital, yes.

4        Q    Is it also not true that minimal contact can

5   result in an exchange or transfer of evidence?

6        A    Well, it is possible, but the more contact,

7   the more likely you would have hairs.

8             MS. BEAUREGARD:  I have nothing further.

9             THE COURT:  Do you have any further

10   questions, Mr. Adkins?

11             MR. ADKINS:  No, Your Honor.

12             THE COURT:  The witness is excused.  Thank

13   you.

14                             (Witness steps down.)

15             THE COURT:  Let me see counsel for

16   scheduling.

17             (Whereupon, counsel approached the bench

18         and a discussion was had off the record, at

19         the conclusion of which counsel returned to

20         the trial table and the following proceedings

21         were had in open court:)

22             THE COURT:  Ladies and gentlemen, before we

23   get to the next witness, it is going to get later than

                    EILEEN G. KIMMEL
                  OFFICIAL COURT REPORTER

LASER STOCK FORM B

THE CORBY GROUP  1-800-255-5040

Exhibit B-10

DAG/PLF ATTY J Adkins

____ ate vs Richard Miller  DEF ATTY R Beauregard

ASE NO(S) 92-12-0044-0046  JUDGE Graves

EARING DATE(S) 5-24-94  CT RPTR Kimmel  CT CK _____

| JURORS | PLF/STATE WITNESSES | DEFENSE WITNESSES |
|---|---|---|
| Mary Farrell | 1. Alice Franklin | 1. Det Steve Jennings |
| Rebecca Roberts | 2. Pamela Franklin | 2. Daryl Mifflin |
| Clarabelle Hastings | 3. Bruce Ritter | 3. |
| Kevin White | 4. Jerome Wright | 4. |
| Michael Richards | 5. Kevin Adams | 5. |
| Clarence Jackson | 6. Officer Bruce Ritter | 6. |
| Robert Sprose | 7. | 7. |
| Gloria Warren | 8. | 8. |
| Delores Fisher | 9. | 9. |
| Ethel Mages | 10. | 10. |
| Mary Elliott | 11. | 11. |
| Beatrice Roth | 12. | 12. |
| *ALTERNATE JURORS*** | 13. | 13. |
| Margaret Simmington | 14. | 14. |
| James Adkins | 15. | 15. |
| | 16. | 16. |
| | 17. | 17. |

| STATE'S EXHIBITS | DEFENSE EXHIBITS |
|---|---|
| | #1 - _____ |
| | #2 - Beebe Medical Center Record |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

CERTIFIED AS A TRUE COPY
ATTEST _____
PROTHONOTARY
CLERK

EXHIBIT-1
B-10   B-10

May 23, 1994
Time Picked 12:55

S T A T E   V.   M I L L E R

| | | | | | |
|---|---|---|---|---|---|
| Budzisz, Stanley E. | White, Kevin H. | Jackson, Clarence R. | Warren, Gloria J. | Magee, Ethel E. | Roth, Beatrice M. |
| Age: 72<br>Race: White<br>Sex: M | Age: 72<br>Race: White<br>Sex: M | Age: 72<br>Race: White<br>Sex: M | Age: 72<br>Race: White<br>Sex: F | Age: 72<br>Race: White<br>Sex: F | Age: 72<br>Race: White<br>Sex: F |
| Occupation: Retired | Occupation: Engineer | Occupation: Technician | Occupation: Manufacturer | Occupation: Factory Worker | Occupation: Machine Operat. |
| Farnell, Mary S. | Hastings, Clarabelle | Richards, Michael R. | Spross, Robert F. | Fisher, Delores F. | Elliott, Mary A. |
| Age: 51<br>Race: White<br>Sex: F | Age: 58<br>Race: White<br>Sex: F | Age: 35<br>Race: White<br>Sex: M | Age: 42<br>Race: White<br>Sex: M | Age: 49<br>Race: White<br>Sex: F | Age: 48<br>Race: White<br>Sex: F |
| Occupation: (not listed) | Occupation: Machine Oper. | Occupation: Construction | Occupation: Unemployed | Occupation: Unemployed | Occupation: Teacher |

## ALTERNATES

| | | |
|---|---|---|
| Barbosa, Mario A. | Robert:, Rebecca K. | Semmington, Margaret R. | Adams, James W. |
| Age: 51<br>Race: Hisp.<br>Sex: M | Age: 25<br>Race: White<br>Sex: F | Age: 66<br>Race: White<br>Sex: F | Age: 66<br>Race: White<br>Sex: M |
| Occupation: Engineer | Occupation: Typist | Occupation: Retired | Occupation: Retired |